UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TIFFANY KEEBY o/b/o T.K.,

                    Plaintiff,

              - against -

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-1202 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Tiffany Keeby brings this action on behalf of T.K., her minor child, under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration denying T.K.'s application for children's Supplemental Security Income ("SSI"). The parties have cross-moved for judgment on the pleadings. For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies Commissioner's cross-motion. The case is remanded for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I.    T.K.'s Personal and Medical History

T.K. was born premature on September 21, 2017 and lives with his mother, Tiffany Keeby, and grandparents. (Administrative Transcript ("Tr.") 13.)[1] T.K. suffers, among other things, from congenital deformity of the feet, duodenal stenosis, and malrotation in the intestines which can cause significant injuries or death if not treated properly. (Tr. 11, 13–14.) At the time his SSI application was decided, T.K. wore a cast and possibly would need foot surgery in the future. (Tr.

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript and not to the internal pagination of the constituent documents.

14.)  At one week old, T.K. required intestinal surgery and hospitalization in the Neonatal Intensive Care Unit ("NICU").  At four months old, T.K. was again hospitalized and required another intestinal surgery.  (Tr. 14.)

Throughout his childhood, T.K. has required close care and monitoring, and emergency and outpatient medical treatment.  As a result, T.K.'s mother took an 8-week maternity leave after his birth and, after returning to work for one week, was terminated for staying with T.K. while he underwent intestinal surgery and hospitalization.  (Tr. 13–14.)  T.K.'s mother has not been able to return to work due to T.K.'s need for monitoring and care.  (Tr. 14.)

## II.   Procedural History

On February 1, 2018, Plaintiff protectively filed an application for SSI on behalf of T.K., a child under the age of 18, alleging disability beginning September 21, 2017, when T.K. was born. (Tr. 10–11.)  The claim was initially denied on July 5, 2018.   (Tr. 10, 55–65.)  Plaintiff filed a written request for a hearing on August 13, 2018.  (Tr. 87.)  On November 12, 2020, Plaintiff appeared and testified in a video hearing before Administrative Law Judge Benjamin Chaykin (the "ALJ").  (Tr. 10.)  Plaintiff was represented by counsel.  (Tr. 10.)  By decision dated March 11, 2020, the ALJ found that T.K. was not disabled within the meaning of the Social Security Act (the "Act") from February 1, 2018, the date of Plaintiff's application, through the date of the ALJ's decision.  (Tr. 16.)  On January 5, 2021, the ALJ's decision became final when the Appeals Council of the SSA's Office of Appellate Operations denied Plaintiff's request for a review of the ALJ's decision.  (Tr. 1–5.)  Thereafter, Plaintiff timely[2] commenced this action.

---

[2] According to Title 42, United States Code, Section 405(g), "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision."  42 U.S.C. § 405(g).  "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary."  *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-

### III.   The ALJ's Decision

#### A.   The Three-Step Inquiry

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); *Miller v. Comm'r of Soc. Sec.*, 409 F. App'x. 384, 386 (2d Cir. 2010) (summary order).[3]  To determine whether a child is eligible for disability benefits, the ALJ follows a three-step sequential evaluation.  20 C.F.R. § 416.924(a). First, the ALJ determines whether the child is engaged in substantial gainful activity; if so, the child is not disabled under the Act and the inquiry ends.  *Id.* §§ 416.924(a), (b).  Second, the ALJ determines whether the child has a medical impairment or combination of impairments that is "severe."  *Id.* § 416.924(a).  An impairment is severe if it causes "more than minimal functional limitations."  *Id.* § 416.924(c).  If the child is found not to have such an impairment or combination of impairments, the child is not disabled and the inquiry ends.  *Id.* §§ 416.924(a), (c).  At the third step, the ALJ must determine whether the impairment meets, medically equals, or functionally equals a disability listed in the SSA's regulatory Listing of Impairments ("Listings").  *Id.* §§ 416.924(a), (d); *id.* pt. 404, subpt. P, app. 1.

---

4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)).  The final decision was issued January 5, 2021 (Tr. 1), and the Complaint was filed on March 5, 2021 (Dkt. 1), 54 days after the presumed receipt date of the decision, rendering this appeal timely.

[3] Unless otherwise noted, all legal citations in this Memorandum and Order omit any internal quotation marks, citations, brackets, ellipses, and footnotes.

The standards for functional equivalence require that a child have an impairment or combination of impairments that results in "marked" limitations in two, or "extreme" limitations in one, of the following six domains: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for yourself; and, (vi) [h]ealth and physical well-being," *Id.* §§ 416.926a(a), (b).

A "marked" limitation exists where the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the level of functioning expected "on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Hoyle ex rel. L.M. v. Comm'r of Soc. Sec.*, No. 16-CV-6395 (PKC), 2018 WL 566444, at *2 (E.D.N.Y. Jan. 26, 2018); 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(C)).

An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is found where a child's functioning is equivalent to that expected with standardized test scores "that are at least three standard deviations below the mean." *Id.* If a child is "frequently ill because of [his] impairment(s) or [has] frequent exacerbations of [his] impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation," then the child's functional limitation may be extreme. *Id.* § 416.926a.

4

### B.      The ALJ's Findings

At step one, the ALJ found that T.K. had not engaged in substantial gainful activity since February 1, 2018, the application date.  (Tr. 11.)

At step two, the ALJ found that T.K had the following severe impairments: congenital deformity of feet, duodenal stenosis, and malrotation.  (Tr. 11.)  The ALJ also found that T.K. had experienced other impairments: (1) "acute bronchitis due to respiratory syncytial virus[4], and secondary diagnosis of otitis media[5]," (2) "mild nasal congestion," (3) "moderate generalized opacification of both lung fields, but normal bowel gas pattern," (4) "small bowel resection in January 2018 for small bowel obstruction," and (5) "abdominal examination noted umbilical hernia."  (Tr. 11.)  The ALJ found these impairments non-severe because they "were either acute and successfully treated in the short term, or else have not been particularly symptomatic during the relevant period, requiring little more than routine and/or conservative management."  (Tr. 11.)

At step three, the ALJ determined that T.K.'s severe impairments did not meet or medically equal any of the impairments in the SSA's Listings.  (Tr. 11.)  In reaching this determination, the ALJ considered Listings 101.02 ("Major Dysfunction of a Joint") and 105.00 ("Digestive System").  (Tr. 12.)  The ALJ then evaluated T.K.'s severe impairments to determine whether they

---

[4] "Respiratory syncytial virus (RSV) infects the lungs and breathing passages, and, in the United States, nearly all children have been infected with RSV by age two. In healthy people, symptoms of RSV infection are usually mild and resolve within a week. However, RSV can cause serious illness or death in vulnerable individuals, including premature and very young infants, children with chronic lung disease or congenital heart disease, and people who are over age 65." , *Respiratory Syncytial Virus (RSV)*, NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASE, https://www.niaid.nih.gov/diseases-conditions/respiratory-syncytial-virus-rsv (last visited September 18, 2022).

[5] "Otitis media" refers to "inflammation or infection located in the middle ear" and can "occur as a result of a cold, sore throat, or respiratory infection." *Ear Infection (Otitis Media)*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/otitis-media (last visited September 18, 2022).

were functionally equivalent to any Listing, and determined that T.K.'s severe impairments did not cause two marked limitations or an extreme limitation in the six functional domains.  (Tr. 12–14.)  Finding state pediatric consultant A. Sinha, M.D.'s opinion persuasive, the ALJ concluded that (1) T.K. had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself, (2) less than marked limitations in the domain of moving about and manipulating objects, and (3) "a marked limitation in health and physical well-being."  (Tr. 13–16.)[6]  As a result, the ALJ found that T.K.'s severed impairments were not functionally equal to a Listing and concluded that T.K. was not disabled within the meaning of the Act.  (Tr. 16.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of benefits.  42 U.S.C. § 405(g).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012); *see Valderrama v. Comm'r of Soc. Sec.*, 379 F. Supp. 3d 141, 145 (E.D.N.Y. 2019) (quoting *Talavera*, 697 F.3d at 151).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).  In determining whether the Commissioner's findings were

---

[6] Although the ALJ referenced consultative pediatric examiner Andrea Pollack, D.O.'s (a doctor of osteopathic medicine, *see What is a DO?*, AMERICAN OSTEOPATHIC ASSOCIATION, https://osteopathic.org/what-is-osteopathic-medicine/what-is-a-do/ (last visited Sept. 18, 2022)) statement "that the claimant should continue to follow up with podiatry, gastroenterology, and pediatrics, for developmental delays and routine care," the ALJ did not indicate how this report factored into his determination because he found that "[t]his statement does not contain an opinion regarding the claimant's level of functioning."  (Tr. 16.)

based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (*per curiam*).

## DISCUSSION

Plaintiff contends that the ALJ erred in determining that Plaintiff's diagnosis does not meet or medically equal Listing 105.00 (Digestive Systems) and that the ALJ did not properly evaluate the evidence in the record. (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. 12, at 6–8.) For the reasons set forth below, the Court grants Plaintiff's motion and remands for the ALJ to further develop the record, explain his determination regarding the Listings with greater specificity, and properly evaluate the opinion evidence. *See Fontanez v. Colvin*, No. 16-CV-1300 (PKC), 2017 WL 4334127, at *13 (E.D.N.Y. Sept. 28, 2017) ("In addition to its authority to affirm, modify, or reverse a final decision, the Court may remand the case for the ALJ to further develop the record, resolve conflicts and ambiguities, or elucidate his or her rationale.").

## I.     The ALJ Failed to Adequately Develop the Administrative Record

### A.     Duty to Develop the Record

Before reaching the merits of a Social Security appeal, "[t]he reviewing court must first be satisfied that the [plaintiff] has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act." *Staib v. Colvin*, 254 F. Supp. 3d 405, 408 (E.D.N.Y. 2017). "The ALJ's failure to develop the record is a threshold issue, because the Court

cannot rule on whether the ALJ's decision regarding [the plaintiff's] functional capacity was supported by substantial evidence if the determination was based on an incomplete record." *Thomas v. Comm'r of Soc. Sec.*, No. 20-CV-5086 (PKC), 2022 WL 523544, at *4 (E.D.N.Y. Feb. 22, 2022).

ALJs have "regulatory obligations to develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see* 20 C.F.R. § 416.912(b)(1). These obligations include obtaining medical opinions from treating physicians – "raw data or even complete medical records are insufficient by themselves to fulfill the ALJ's duty. . . . It is the *opinion* of the treating physician that is to be sought. . . . " *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *11 (S.D.N.Y. Aug. 6, 2021); *see also Alvarez v. Comm'r of Soc. Sec.*, No. 14-CV-3542 MKB, 2015 WL 5657389, at *18 (E.D.N.Y. Sept. 23, 2015) ("In order to satisfy his threshold duty to develop the record, the ALJ had an obligation to obtain an opinion from Plaintiff's medical sources, including . . . doctors Plaintiff[] referenced in her testimony."). A medical opinion provides an assessment of the functional limitations resulting from a plaintiff's impairments and is thus critical to determining disability. *Vargas v. Comm'r of Soc. Sec.,* No. 20-CV-4363 (PKC), 2022 WL 462392, at *5 (E.D.N.Y. Feb. 15, 2022); *see also LaFerrera o/b/o M.J.S. v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 308, 323–24 (E.D.N.Y. 2017) ("[Treating physician opinions] are likely to be [from] the medical professionals most able to provide a detailed, longitudinal picture of [the Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."). Even where the treating

physician rule does not apply,[7] "[a] medical opinion is part of the necessary information that an ALJ should attempt to obtain from a treating physician." *Prieto*, 2021 WL 3475625, at *11; *see also Sutton*, 2022 WL 970748, at *4 ("Although ALJs are no longer directed to afford controlling weight to treating source opinions, the regulations still recognize the foundational nature of the observations of treating sources, and consistency with those observations is a factor in determining the value of any [treating source's] opinion.").

To obtain a medical opinion, an ALJ must make an initial request for medical opinions and, if necessary, a follow-up request. *Vargas*, 2022 WL 462392, at *5; 20 C.F.R § 404.1512(b)(1)(i). "[E]ven [when the claimant] did not raise the issue, the Court must independently consider whether the ALJ failed to satisfy his duty to develop the record." *Lebby v. Comm'r of Soc. Sec.*, No. 20-CV-4760 (PKC), 2022 WL 580983, at *4 (E.D.N.Y. Feb. 24, 2022). This duty exists even if the plaintiff is represented by counsel. *See Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015). The ALJ must fulfil this duty "even where . . . Plaintiff's attorney can be said to have informed the ALJ that it was unnecessary to request the missing records." *Benjamin v. Colvin*, No. 16-CV-1730 (LDH), 2017 WL 4402445, at *8 (E.D.N.Y. Sept. 30, 2017); *see also Corona v. Berryhill*, No. 15-CV-7117 (MKB), 2017 WL 1133341, at *16 (E.D.N.Y. Mar. 24, 2017) ("The ALJ's discussion on the record with Plaintiff's counsel regarding [a physician's] treatment notes and her decision to leave the record open for thirty days for the submission of his records were not sufficient to satisfy

---

[7] Due to recent regulatory amendments, the treating physician rule does not apply to claims, such as this one, filed after March 27, 2017, *see* 20 C.F.R. §§ 404.1527, 404.1520c; *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, *5867–68 (Jan. 18, 2017), and thus the ALJ and Commissioner have greater flexibility in weighing medical opinions on the record. However, this increased flexibility in weighing the evidence does not relieve ALJs of their duty to develop the record. *See, e.g.*, *Alfonso v. Comm'r of Soc. Sec.*, No. 20-CV-3914 (LDH), 2022 WL 219575, at *7 (E.D.N.Y. Jan. 20, 2022).

her duty because the ALJ took no further action to ensure that the record was complete. . . . ").[8]
The "ALJ's failure to adequately develop the record is grounds for remand." *Chapman v. Comm'r
of Soc. Sec.*, No. 19-CV-1873 (PKC), 2020 WL 5763629, at *3 (E.D.N.Y. Sept. 27, 2020).

###### B.   The ALJ Failed to Develop the Record

Here, the ALJ's failure to obtain a medical opinion from any of Plaintiff's treating
physicians requires remand to allow the ALJ to further develop the record.   The ALJ only
considered the medical opinion of state pediatric consultant A. Sinha, M.D., who did not examine
Plaintiff, but instead based his opinion solely upon his review of Plaintiff's medical records.  (Tr.
15.)[9]   Although new regulations require that all expert medical opinions be assessed under the
same standard, 20 C.F.R. § 404.1520c(a), "[t]he general rule is that the written reports of medical
advisors who have not personally examined the claimant deserve little weight in the overall
evaluation of disability.  The advisers' assessment of what other doctors find is hardly a basis for
competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan*, 898
F.2d 293, 295 (2d Cir. 1990); *see also Commisso v. Comm'r of Soc. Sec.*, No. 20-CV-4872 (PKC),
2022 WL 742871, at *8 (E.D.N.Y. Mar. 11, 2022) ("While the ALJ found the state medical
consultants' opinions to be most persuasive, the medical opinion of a non-examining medical
expert does not constitute substantial evidence and may not be accorded significant weight."

---

[8] Plaintiff's attorney told the ALJ at the time of the hearing that, other than some missing
records from NYU Winthrop Hospital from December 19, 2019, there were no other outstanding
records.  (Tr. 36.)  "That response, however, did not obviate the ALJ's *independent duty* to develop
the record." *Amrhein Deruchie v. Comm'r of Soc. Sec.*, No. 18-CV-227, 2019 WL 5208123, at *8
(W.D.N.Y. Oct. 16, 2019).

[9] As discussed, the ALJ mentioned the statement of consultative pediatric examiner Andrea
Pollack, D.O., but clarified that "[t]his statement does not contain an opinion regarding the
claimant's level of functioning."  (Tr. 16.)

(citing *Roman v. Astrue*, No. 10-CV-3085 (SLT), 2012 WL 4566128, at \*16 (E.D.N.Y. Sept. 28, 2012); *accord Green-Younger v. Barnhart*, 335 F.3d 99, 107–08 (2d Cir. 2003)).

Here, the ALJ did not consider a single medical opinion from either of T.K.'s treating physicians, Dr. Sathyaprasad Burjonrappa, M.D., T.K.'s gastroenterology specialist, and Dr. Martocci, D.O., his primary care physician.  (Tr. 47–48.)  The nearly 3,000-page record contains no medical opinions from either Dr. Burjonrappa or Dr. Martocci, even though the record does include records of hospital visits with Dr. Burjonrappa (Tr. 270–1082; 1083–2257; 2268–2323), and primary care visits with Dr. Martocci (Tr. 2712–60).   In fact, the ALJ did not even mention Drs. Burjonrappa or Martocci in his decision, even though Plaintiff specifically testified to their treatment of T.K. during the hearing before the ALJ.  (Tr. 47–48).  The record does not demonstrate any attempt by the ALJ to obtain medical opinions from Drs. Burjonrappa or Martocci.

The ALJ also did not consider, and the record does not contain, either the opinion of Heidi Kubit, N.P., a nurse practitioner employed in the same office as Dr. Martocci  (Tr. 2727), or the opinion of Barbara Resseque, DPM,[10] who evaluated T.K.'s foot impairments (Tr. 2258–62). Under the new regulations, nurse practitioners and podiatrists are acceptable medical sources.  20 C.F.R. § 416.902.  Accordingly, the ALJ should have sought medical opinions from these treating sources.

The ALJ's failure to attempt to obtain such opinions "alone warrants remand."  *Thomas*, 2022 WL 523544, at \*7 (citing *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (remanding because the ALJ failed to obtain "adequate information from [plaintiff's] treating physician"); *see also Wilson v. Colvin*, 107 F. Supp. 3d 387, 404–08 (S.D.N.Y. 2015) (remanding due to the ALJ's

---

[10] A "D.P.M." is a doctor of podiatric medicine.  *Becoming a Podiatric Physician*, AMERICAN ASSOCIATION OF COLLEGES OF PODIATRIC MEDICINE, https://osteopathic.org/what-is-osteopathic-medicine/what-is-a-do/ (last visited Sept. 18, 2022).

failure to fill an obvious gap in the record).  On remand, the ALJ should, at a minimum, obtain the opinions of T.K.'s treating physicians, nurse practitioner, and podiatrist regarding his functional limitations.

**II.**    **The ALJ Did Not Sufficiently Explain His Conclusions Regarding the Listings**

    **A.**    **Duty to Explain Reasoning**

At step three of the sequential analysis described above, the ALJ must determine whether the claimant's severe impairments, individually or in combination, meet, medically equal, or functionally equal a disability included in the Listings.  20 C.F.R. § 416.924(a); *id.* pt. 404, subpt. P, app. 1.  The claimant has the burden of providing evidence that his impairments meet, medically equal, or functionally equal the Listings.  However, "courts have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the Listings where the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Colon v. Saul*, No. 20-CV-2113 (KAM), 2021 WL 2827359, at *5 (E.D.N.Y. July 7, 2021); *see also Woods v. Saul*, No. 19-CV-336S (SN), 2021 WL 848722, at *15 (S.D.N.Y. Mar. 5, 2021) ("[T]he ALJ must provide an explanation of his reasoning as to why he believes the requirements are not met and explain the credibility determinations and inferences he drew in reaching that conclusion."); *Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012) ("Mere recitation of the medical evidence is insufficient unless the reports referred to contain substantiated conclusions concerning the Listings, and the ALJ expressly adopts the reasoning of those conclusions.").  Such an explanation is required so that the ALJ can "build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review."  *Colon*, 2021 WL 2827359, at *5 (quoting *Hamedallah*, 876 F. Supp. 2d at 142).

**B.      The ALJ's Failiure to Sufficiently Explain His Conclusion**

There is evidence in the record that T.K.'s intestinal impairments met many of the requirements of Listing 105.00 ("Digestive System") in children.  While T.K. has never been diagnosed with inflammatory bowel disease ("IBD"), he has been diagnosed with symptoms that accompany IBD, documented by medically acceptable imaging (Tr. 674, 687, 748, 753–54, 760–61, 774–75, 1103, 1238, 1255, 1404–05, 1833) and operative findings (Tr. 674, 1036–37, 1744–45, 1752).[11]  T.K. required hospitalization for surgery due to obstruction of stenotic areas on two occasions within four months of his birth.  The hospitalizations were more than 60 days apart but within six months of each other.  Specifically, in September 2017, six days after he was born, right after his mother had taken him home from the NICU, T.K. was admitted to the hospital, where Dr. Burjonrappa diagnosed him with "congenital absence, atresia and stenosis of duodenum,"[12] and "congenital malformations of intestinal fixation."  (Tr. 533.)  These diagnoses were made through x-ray image findings of "dilation of the first, second and third portions of the duodenum," which were indicative of "[o]bstruction at the third portion of the duodenum . . . compatible with duodenal stenosis."  (Tr. 761.)  Because these diagnoses were life-threatening without surgical correction,

---

[11] Listing 105.06 defines inflammatory bowel disease as the following:

Inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with: Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6–month period. . . .

20 C.F.R. pt. 404, subpt. P, app. 1.

[12] "Duodenal atresia or stenosis occurs when the intestine does not develop normally and leads to a blockage in the continuity of the intestine."  *Duodenal Atresia or Stenosis in Infants*, CHILDREN'S NATIONAL, https://childrensnational.org/visit/conditions-and-treatments/prenatal-care-pregnancy/duodenal-atresia-or-stenosis-in-infants (last visited Apr. 22, 2022).

T.K. underwent an "exploratory laparotomy"[13] and "repair of malrotation,[14] duodeno-jejunostomy,[15] and lysis of Ladd['s] bands,[16] and inversion appendectomy." (Tr. 672, 674; *see also* Tr. 533, 1022, 1036 – 37). Approximately four months later, in January 2018, T.K. was again hospitalized for intestinal obstruction (Tr. 1208), found to be a "mid to distal partial but high-grade small bowel obstruction" (Tr. 1442), again diagnosed through x-ray imaging[17] (Tr. 1238, 1255,

---

[13] "Exploratory laparotomy" is an "[a]bdominal exploration [] surgery." *Abdominal Exploration*, MOUNT SINAI, https://www.mountsinai.org/health-library/surgery/abdominal-exploration (last visited Sept. 18, 2022).

[14] "Malrotation is a rare prenatal abnormality in which a baby's intestine [does not] form or rotate in the right way in their abdomen. . . . Malrotation . . . [is not] often evident unless a baby experiences an abnormal twisting of the intestine known as a volvulus. A volvulus causes an obstruction or blockage in the intestine, preventing food from being digested normally. The blood supply to the twisted part of the intestine can also be cut off, leading to the death of that segment of the intestine. This situation is an emergency and must be treated as soon as possible." *Malrotation*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/10029-malrotation (last visited Apr. 22, 2022).

[15] "Duodeno-jejunostomy" is "a surgical operation that joins part of the duodenum [(the first part of the small intestine)] and the jejunum [(the section of the small intestine that comprises the first two fifths beyond the duodenum)] with creation of an artificial opening between them." *Duodenojejunostomy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/duodenojejunostomy (last visited Sept. 18, 2022); *Duodenum*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/duodenum (last visited Sept. 18, 2022); *Jejunum*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/jejunum (last visited Sept. 18, 2022).

[16] Ladd's bands are "congenital bands extend[ing] from the right lateral abdominal wall, across the duodenum and attach to the undescended caecum. [They] compress the duodenum and can potentially cause duodenal obstruction." Emanuwa *et al.*, "Midgut malrotation first presenting as acute bowel obstruction in adulthood: a case report and literature review," 6 WORLD J. EMERGENCY SURGERY 22 (2011), https://wjes.biomedcentral.com/articles/10.1186/1749-7922-6-22 (last visited Sept. 18, 2022).

[17] "Intestinal obstruction is a blockage that keeps food or liquid from passing through your small intestine or large intestine (colon). . . . Without treatment, the blocked parts of the intestine can die, leading to serious problems. However, with prompt medical care, intestinal obstruction often can be successfully treated." *Intestinal obstruction*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/intestinal-obstruction/symptoms-causes/syc-20351460 (last visited Apr. 22, 2022).

1410–11, 1442, 1833).   These diagnoses were life-threatening without surgical correction and required T.K. to undergo "exploratory laparotomy, lysis of adhesions[18] and resection anastomosis of [the] jejunum[19]."   (Tr. 1752.)

However, there is also evidence in the record suggesting that T.K. may not meet some of the elements of Listing 105.00.   As previously mentioned, there is no diagnosis of IBD in T.K.'s record.   Further, Listing 105.06(A) specifies that the obstruction of stenotic areas not be from adhesions, and T.K. underwent lysis of adhesions during his second surgery.   (Tr. 1752.) Additionally, the Commissioner is correct that T.K. does not meet the requirements for short bowel syndrome because, while a small portion of his small intestine was removed during his surgery because his surgeons feared further complications (Tr. 1752), T.K. has not had more than one half of his small intestine removed such that he is dependent on daily parenteral nutrition. (Memorandum of Law in Support of the Defendant's Cross-Motion ("Def. Mem."), Dkt. 17, at 11.)[20]  Instead of discussing the evidence as a whole, however, the ALJ made a conclusory finding that T.K. did "not meet the criteria for presumptive disability under Listing 105.00, Digestive

---

[18] "Adhesions are bands of scar-like tissue. . . . Adhesions cause tissues and organs to stick together. They might connect the loops of the intestines to each other, to nearby organs, or to the wall of the abdomen. They can pull sections of the intestines out of place. This may block food from passing through the intestine." *Adhesions*, MEDLINEPLUS, https://medlineplus.gov/adhesions.html (last visited Apr. 22, 2022).

[19] "Anastomosis is the connection of two things that are normally diverging. In medicine, an anastomosis typically refers to a connection between blood vessels or between two loops of the intestine." *What is Anastomosis*, HEALTHLINE,  https://www.healthline.com/health/anastomosis (last visited Sept. 18, 2022).

[20] Listing 105.07 defines short bowel syndrome as "surgical resection of more than one-half of the small intestine, with dependence on daily parenteral nutrition via a central venous catheter."   20 C.F.R. pt. 404, subpt. P, app. 1.

System," and quoted portions of the Listings without any explanation.[21]   (Tr. 12.)   The ALJ's treatment of the Listings does not enable the Court to determine whether the ALJ's decision is supported by substantial evidence because the ALJ has not provided the Court with a "logical bridge" to "enable meaningful review."   *Horton*, 2021 WL 1199874 at *12; *see also Hamedallah*, 876 F. Supp. 2d at 145 ("In light of the ALJ's failure to provide a sufficient rationale, the Court is unable to conclude that the ALJ's finding that E.B. fails to meet or medically equal a listed impairment is supported by substantial evidence.").   On remand, "the ALJ is directed to address all conflicting evidence and provide reasons for discounting that evidence which he rejects." *Colon*, 2021 WL 2827359, at *9; *see also Proper v. Comm'r of Soc. Sec.*, No. 12-CV-98 (MAT), 2014 WL 7271650, at *11 (W.D.N.Y. Dec. 18, 2014) (remanding where "with regard to Listing 1.04, the ALJ did not analyze, much less mention, any of the relevant medical evidence regarding Plaintiff's diagnoses. . ."); *Giambrone v. Colvin*, No. 15-CV-5882 (PKC), 2017 WL 1194650, at *18 (E.D.N.Y. Apr. 3, 2017) (remanding where "the ALJ merely stated that 'the record does not document the required symptoms necessary to meet the requirements'").[22]

---

[21]   In his decision, the ALJ wrote: "[t]he claimant has not presented evidence of gastrointestinal hemorrhaging, chronic liver disease, inflammatory bowel disease, short bowel syndrome with dependence on daily parenteral nutrition via central nervous catheter, growth failure, or other disorder that meets the criteria for finding disability under this listing."   (Tr. 12.)

[22]   While the ALJ does not methodically go through the Listings in his decision, the Commissioner does so in her brief.   (Def. Mem., Dkt. 17, at 10–12.)   The Commissioner's assessment, however, is also lacking.   For example, Listing 105.02 is "Gastrointestinal hemorrhaging from any cause, requiring blood transfusion (with or without hospitalization) of at least 10 cc of blood/kg of body weight, and occurring at least three times during a consecutive 6–month period."   20 C.F.R. pt. 404, subpt. P, app. 1.   The Commissioner argues that T.K.'s impairments do not meet Listing 105.02 because "Plaintiff has pointed to no evidence that T.K. had any blood transfusions, let alone three in a six month period."   (Def. Mem., Dkt. 17, at 10.) However, T.K.'s medical record shows that T.K. did in fact have a transfusion during his hospitalization for his second surgery.   (Tr. 1379, 1407, 1422, 1829.)   While one transfusion does not meet the requirement for Listing 105.02, the ALJ's failure to mention this transfusion and the Commissioner's oversight further suggests the lack of "an accurate and logical bridge" between

### III.     The ALJ Failed to Properly Evaluate the Opinion Evidence

#### A.     Duty to Evaluate Opinion Evidence

Under the new regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the plaintiff's] medical sources."  20 C.F.R. § 404.1520c(a), § 416.920c(a).  Instead, an ALJ will evaluate medical opinions, regardless of the source, based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length, purpose, and extent of the treating relationship, and whether the source of the opinion physically examined the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c.  Of these factors, supportability and consistency are the most important.  *Id.*

While an ALJ may consider the other factors, the ALJ must explain, at a minimum, how he evaluated the supportability and consistency of a medical opinion in his decision.  *Prieto*, 2021 WL 3475625, at \*9; *see also Vellone v. Saul*, No. 12-CV-261 (RA) (KHP), 2021 WL 319354, at \*6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom., Vellone on behalf of Vellone v. Saul*, No. 20-CV-261 (RA), 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("[I]n cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion. . . ."); *Carolyn P. o/b/o T.R.M. v. Comm'r of Soc. Sec.*, No. 20-CV-6650 (CJS), 2022 WL 896765, at \*5 (W.D.N.Y. Mar. 28, 2022) ("[T]he regulations state that the ALJ *must* explain how he considered the supportability and consistency

---

the ALJ's conclusion and the medical evidence, which is grounds for remand.  *See Horton*, 2021 WL 1199874 at \*12.  The omission of this evidence is further concerning given the ALJ's failure to develop the record.

factors for each medical source's opinion, but is not required to explain how he considered the remaining factors."); 20 C.F.R. § 404.1520c.  These "articulation requirements in the final rules are intended to allow a . . . reviewing court to trace the path of an adjudicator's reasoning." *Prieto*, 2021 WL 3475625, at *9; *see also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017).  "[A]n ALJ's failure to properly consider and apply the requisite factors is grounds for remand."  *Prieto*, 2021 WL 3475625, at *9.

An ALJ analyzes the supportability of a medical opinion by "assess[ing] the objective medical evidence and supporting explanations presented with the medical opinions." *Id.* at *13; *see also Carolyn P.*, 2022 WL 896765, at *5 ("With respect to supportability, the new regulations provide that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."); 20 C.F.R. § 404.1520c.  An ALJ also analyzes the consistency of a medical opinion with respect to the other medical and non-medical sources in the record.  *Prieto*, 2021 WL 3475625, at *13; *see also Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7–8 (W.D.N.Y. 2021) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."); 20 C.F.R. § 404.1520c.

### B.   The ALJ's Failure to Explain His Evaluation of Opinion Evidence

The ALJ erred by failing to adequately explain his application of the supportability and consistency factors to consulting examiner Dr. Sinha's opinion—the only opinion that the ALJ

evaluated.  Dr. Sinha opined that T.K. "ha[d] no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, or caring for self; less than marked limitation in moving about and manipulating objects; and marked limitation in health and physical well-being."  (Tr. 15.)  Despite an inadequate discussion of the supportability and consistency of Dr. Sinha's opinion, the ALJ found it "persuasive."

For example, the ALJ found that Dr. Sinha's opinion was "supported by a thorough summary and analysis of the available evidence including a detailed summary of examination findings and medical treatment history. . .  [and] by the claimant's treatment history and mostly normal objective findings as summarized and discussed in this opinion." (Tr. 15–16.)  However, the ALJ did not explain which parts of the record supported Dr. Sinha's "thorough summary and analysis of the available evidence."  *See Warren I. v. Comm'r of Soc. Sec.*, No. 20-CV-495 (ATB), 2021 WL 860506, at *7 (N.D.N.Y. Mar. 8, 2021) (remanding where "the ALJ failed to discuss what, if any, objective medical evidence and/or supporting explanations provided by [the consultative examiner] she relied on in evaluating the opinion.").   In fact, to support the analysis of the supportability factor, the ALJ referred to his own evaluation of T.K's functional limitations with respect to his impairments.  (Tr. 16.)  This was error.  "[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."  *Genna v. Comm'r of Soc. Sec.*, No. 19-CV-6878 (PKC), 2021 WL 1176144, at *2 (E.D.N.Y. Mar. 28, 2021); *see also Sutton v. Comm'r of Soc. Sec.*, No. 20-CV-3441 (PKC), 2022 WL 970748, at *6 (E.D.N.Y. Mar. 31, 2022) ("[T]he ALJ was not 'permitted to substitute his own expertise or view of the medical proof.'" quoting *Flynn v. Comm'r of Soc. Sec. Admin.,* 729 F. App'x 119, 121 (2d Cir. 2018) (summary order)); *see also Lawton v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 378, 383 (W.D.N.Y.

2019) ("An ALJ is prohibited from playing doctor in the sense that an ALJ may not substitute his own judgment for competent medical opinion." (internal quotation marks and citation omitted)).

Similarly, the ALJ found Dr. Sinha's opinion "consistent with the record as a whole, giving some consideration to the claimant's subjective complaints, and mostly normal examination findings, with some ongoing subjective digestive complaints." (Tr. 16.)  However, the ALJ failed to explain which parts of the record were consistent with Dr. Sinha's opinion.  The ALJ failed to explain how Plaintiff's testimony that T.K.'s intestinal impairments were "going to be an ongoing issue for the rest of his life" and "can be very fatal if not treated right away" (Tr. 43–46) were consistent with only "marked" limitations in health and well-being.  The ALJ further did not explain how his assessment that the record lacked signs of "significant problems with malrotation with many exams within normal limits" was consistent with Plaintiff's testimony that T.K.'s impairments were "not something that's okay, well, [he] had two surgeries, [he's] healed.  It doesn't work that way.  There's cases where this happens . . . four years down the line, five years down the line.  This is something that's always going to be an ongoing thing for him for the rest of his life," (Tr. 46–46).[23]

Furthermore, while the record reflects seven days of visits to T.K.'s pediatrician (Tr. 2713–21, 2723–30, 2748–60), five post-surgery follow up visits with Dr. Burjonrappa (Tr. 2269, 2280, 2291, 2302, 2313), and one visit with consultative examiner Dr. Pollack where T.K. was not having any acute intestinal issues (Tr. 2325–27), the ALJ failed to mention T.K.'s five-day hospitalization in the NICU (Tr. 203–69), ten-day hospitalization for his first emergency intestinal surgery (Tr.

_____

[23] Indeed, there are indications in the medical records that T.K.'s intestinal impairments could be an ongoing issue for him throughout his life, and not merely fixed through his two surgeries.  (*See e.g.* Tr. 1451 ("[R]ecurrent [small bowel obstruction]" is a risk of T.K.'s intestinal surgeries); Tr. 1582 (advising that T.K. may require further surgeries for small bowel obstruction).)

544–1152), and eleven-days hospitalization for his second emergency intestinal surgery (Tr. 1208–1895).  The ALJ's decision to select evidence from the record that was consistent with Dr. Sinha's opinion, while disregarding evidence that was inconsistent with her opinion, "reflect[s] impermissible cherry-picking of evidence from the record that only supports his findings."  *Heuser v. Comm'r of Soc. Sec.*, No. 20-CV-3601 (PKC), 2022 WL 970746, at *10 (E.D.N.Y. Mar. 31, 2022); *see also Gough v. Saul*, 799 F. App'x 12, 14 (2d Cir. 2020) (summary order) ("We fear that the ALJ cherry-picked evidence from the record to support his conclusion that [the plaintiff] could work full time even though the record as a whole suggested greater dysfunction.").  The ALJ's cherry-picking of certain evidence from the record without adequate analysis of the supportability and consistency factors is grounds for remand.  *Prieto*, 2021 WL 3475625, at *14; *see also Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL 5848776, at *9 (N.D.N.Y. Oct. 1, 2020) (remanding because an ALJ's decision to "pick and choose evidence in the record that supports his conclusions" was an incomplete review of the record which "failed to set forth the crucial factors justifying the ALJ's findings with sufficient specificity to allow the Court to determine whether substantial evidence supported the assigned persuasiveness of the opinions of [the medical sources] in accordance with the regulations.").

Thus, the ALJ's failure to sufficiently explain how he evaluated the medical opinions in the record warrants remand.

## IV.   The ALJ Failed to Evaluate Plaintiff's Self-Reported Limitations

### A.   Duty to Evaluate Plaintiff's Testimony

Where a disability claimant is under 18 years old and unable to adequately describe his disability, the ALJ should seek and evaluate testimony by someone who can speak to "the effects of [the claimant's] impairment(s) on [the claimant's] activities and how [the claimant] function[s] on a day-to-day basis," such as a parent.  20 C.F.R. § 416.924a; *Williams o/b/o L.L.W. v. Bowen*,

859 F.2d 255, 259, 261 (2d Cir. 1988); *see also Hoyle*, 2018 WL 566444, at *4 ("Because L.M. is a minor and cannot testify about her disability, the ALJ must seek and evaluate her mother's testimony."). "As a fact-finder, an ALJ is free to accept or reject testimony [of the guardian of a disabled child]. A finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record. The failure to make credibility findings . . . fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support [the] conclusion that claimant is not under a disability." *Williams*, 859 F.2d 255, 260–61; *Carroll v. Sec. of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983); *Hamedallah*, 876 F. Supp. 2d at 152–53.

**B.      The ALJ's Failure to Assess Plaintiff's Credibility**

Although the ALJ summarized Plaintiff's testimony (Tr. 13–14), the ALJ neither considered that testimony's consistency with the other evidence in the record, nor provided any assessment of Plaintiff's credibility. The ALJ's failure to assess Plaintiff's credibility is especially significant in light of the Commissioner's argument that appears to insinuate that there is reason to doubt Plaintiff's credibility. In recounting T.K.'s history of medical visits, the Commissioner writes:

> In a supervisory note, the attending doctor documented Plaintiff's claim that she had brought T.K. to the emergency department because T.K.'s primary medical provider told her that a "shot" worked faster. The doctor explained to Plaintiff that either way T.K. would still have to complete a full course of antibiotics. The doctor spoke with Heidi Kubit, the nurse practitioner at Dr. Martocci's office who confirmed that the office did not advise Plaintiff to go to the emergency department for a shot. There was no further intervention as T.K. was being properly managed by his primary care provider, and T.K. was discharged.

(Def. Mem., Dkt. 17, at 6 (internal citations omitted).)

This description of Plaintiff's search for a shot for T.K., and the statement that Plaintiff's primary care provider had not advised Plaintiff to search for one, could give the impression that

Plaintiff was seeking out ill-advised treatment for T.K., the implication being that Plaintiff was both not a credible reporter for assessing T.K.'s functional limitations and also did not follow medical advice with respect to T.K.'s care. Such an argument is gratuitous for two reasons. First, this medical visit appears to be irrelevant to the issue of T.K.'s claimed medical impairments because Plaintiff was seeking care for T.K. for a respiratory issue (*see* Tr. 2675), not intestinal or foot issues. Second, the Commissioner fails to mention that during a different visit, when T.K. was also experiencing a respiratory issue, Ms. Kubit did refer Plaintiff to the emergency department for "IM steroid and abx," which stands for an intramuscular steroid shot and antibiotics. (Tr. 2729.); *see also* Tuoro University, "Medical Abbreviations," https://cop.tu.edu/studentresources/2017_medical_abbreviations.pdf. It is thus plausible that Plaintiff simply misunderstood that advice to be applicable to the visit described by the Commissioner—making any inference of Plaintiff's lack of credibility due to this incident immaterial and gratuitous.

Because the ALJ failed to "assess [P]laintiff's credibility in light of all evidence in the record and provide clear, specific reasons for the credibility assigned to [P]laintiff's statements regarding the intensity, persistence, and limiting effects of claimant's symptoms," the Court remands for the ALJ to provide further findings and a clear explanation of his decision as to Plaintiff's credibility. Furthermore, if the ALJ had credited Plaintiff's testimony that T.K.'s intestinal impairments would "be an ongoing issue for the rest of his life," T.K. may have met the "extreme" limitation standard of the "health and well-being" domain, which requires "episodes of illness or exacerbations that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation," and could, therefore, qualify for disability benefits. 20 CFR § 416.926a(e)(2); *see also Hoyle*, 2018 WL 566444, at *4 ("Given

how crucial [plaintiff's] credibility was to the ALJ's determination of whether L.M. has a 'marked' limitation or possibly an 'extreme' limitation based on the frequency of her seizures[,] . . . the ALJ's failure to develop the record with respect to [plaintiff's] testimony and credibility warrants remand.").

Thus, due to the importance of Plaintiff's testimony in the ALJ's determination of whether T.K. had a "marked" limitation or an "extreme" limitation based on the severity and recurrence of T.K.'s intestinal impairments, the ALJ's failure to develop the record with respect to Plaintiff's testimony and credibility warrants remand. *Pollack v. Comm'r of Soc. Sec.*, No. 14-CV-7120, 2016 WL 1274540, at *15 (E.D.N.Y. Mar. 31, 2016).

## CONCLUSION

For the reasons explained herein, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 23, 2022
        Brooklyn, New York

24